No. 5629.

# P. S. VICKNAIR vs. SOUTHSIDE PLANTATION CO.

## Syllabus.

1. Amendments supplying mere omissions in pleadings may be allowed at any time before final judgment on exceptions aimed thereat.

2. Where a particular cause is assigned for the discharge of an employee, the justification must be confined to that one cause.

3. Where a party gives a reason for his conduct and decision touching anything in a controversy, he cannot after litigation is begun change his ground and put his conduct upon another and different consideration.

4. The peremptory refusal of an employee to obey an apparently reasonable order, without assigning any reason at the time, amounts to a defiance of authority sufficient to warrant his discharge, and his reasons will not thereafter be inquired into.

Appeal from the 28th Judicial District Court, Parish of Jefferson, No. 1075. Hon. P. E. Edrington, Judge.

F. T. Middleton, A. E. Billings, for plaintiff and appellee.

A. G. Brice, L. H. Marrero, Jr., A. W. Cooper, for defendant and appellant

His Honor, JOHN ST. PAUL, rendered the opinion and decree of the Court, as follows:

Plaintiff claimed a balance due him for salary, alleging a contract of employment for a year and a discharge without cause before the end of the term.

Defendant filed an exception of "no cause of action" based upon the omission of some alleged essential averment touching the contract; and pending action on this

— 43 —

exception plaintiff tendered and the Court allowed an amendment supplying the alleged omission.

We think the amendment was properly allowed. Amendments supplying mere omissions in pleadings may be allowed at any time before final judgment on exceptions aimed thereat.

> Reuther vs. Kansas City Milling Co., 2 Orleans Ct. of Appeal, 389.

Such amendments are clearly in furtherance of justice, since judgments based on exceptions of that nature constitute mere non-suits (8 Orleans Ct. App., 392), and do not end the controversy (119 La., 1064), which may always be renewed with the missing allegations supplied (47 An., 109).

## On The Merits.

The contract of employment is proved; the discharge is admitted, and defendant sets up justification.

Of the alleged causes for the discharge all but one (to which we shall return hereafter), are frivolous and unfounded, even if well founded, they have been condoned; and even if not condoned, they cannot now be urged as defenses herein, for the discharge assigned a particular cause to which defendant must be confined.

> Warner vs. Fabacher, 6 Orleans C. A., 37.

Among the causes set up as justification for the discharge is "Insubordination." And that was the cause assigned at the time of the discharge, the circumstances of which were as follows:

Plaintiff, was an overseer on Estelle Plantation, under the direct and immediate authority of J. C. Rousseau, defendant's field manager, who resided on the adjoining plantation known as "Southside." He was to obey the instructions given him by the latter, unless instructed in

writing to the contrary by F. A. Ames, defendants' general manager, who had authority over both.

The current year of the contract was 1909, and on June 16th, of that year, Rousseau wrote to plaintiff as follows:

"Referring to our conversation of yesterday in which I told you of all the reports that had been made me concerning you, viz: that you were keeping a certain young negro girl on Estelle and that your jealousy caused you to threaten with discharge or worse, any of the hands who dared to talk to the said negro girl. I also told you that a few of the hands had already left Estelle on that account and that I was informed that more of them would follow. I told you that all of this had to cease or I would be obliged to make a change of the overseer on Estelle. You will remember that you denied that there was any truth in what had been told me, * * * You asked me not to make a change, and to allow you to finish the year; this I promised to do, provided you would send the girl away from the plantation, and that you would have no trouble with the hands to cause them to leave the plantation. You agreed then and there that you would get the negro girl off the plantation.

"I left Estelle believing that this matter was closed and that we understood each other. Therefore I was much surprised on this morning when you told me that you had reconsidered this matter, and had decided not to send this negro girl away.

"Now since you refused to do that which I had asked you to do, and that which you had promised you would do, I now notify you by this letter that on the 15th day of July, 1909, I will have some one to replace you as overseer on Estelle Plantation, and will not need your services after that date."

To this communication plaintiff made no direct reply; but on June 18th he wrote to Ames, then absent from the State, as follows:

"I was very much surprised Monday the 15th, inst. when Mr. Rousseau came to me demanding my resignation, giving for reason that someone had informed him that I was keeping a negro girl on the place, and that no one dared to look or speak to said girl unless I threatened to discharge or worse, by which I suppose he meant to kill. He also told me that he was told a few of the hands had already left on that account and more would follow. I told him there was not a word of truth in all of this and no one had left the plantation but one Tom Gaspar that I ordered off the plantation for carrying a concealed weapon, and discharging his pistol in the limits of the plantation, Mr. Rousseau taking part with this negro and causing all this trouble. Mr. Rousseau had the nerve to ask me to resign verbally, on the ground that he is a friend of mine, and for that reason would not write, so he said, because he would have to keep a copy of the letter which would remain on file in the office, and that the public would have access to same, which would reflect on me in the future. Mr. Rousseau then proposed to me that if I would send this girl away I could remain on the plantation. I again told him that I would think over this matter and would let him know the following day. In the meantime I learnt that his brother Octave, who is on Christmas trucking, had been trying to have these people to move down there to work for him. The fact is, I positively refused to comply with his request. Mr. Rousseau also remarked to me that I had made various reports to you concerning him, which I leave to you for facts; from all observations, as any fair minded man can see, my discharge is caused only through pure contemptible prejudice and malice since I reported to you that he had destroyed the corn, which he actually did, though I advised him that I was going to do it.

"Now Mr. Ames I have explained the facts on my side of the case and I now leave the matter to your consideration; should you have given Mr. Rousseau authority to do as he has seen fit to do, I will leave

— 46 —

your plantation on the 15th day of July, as per his letter.

"In awaiting your decision, I remain, etc."

Mr. Ames returned no direct answer to this appeal, but on June 24th he wrote to the defendant company as follows:

"Regarding Mr. Vicknair, a letter from him denies emphatically the charges made by Mr. Rousseau; as I know nothing else about the matter, can form no opinion. Such actions on the part of Vicknair are absolutely different from my knowledge of him, and as one of his daughters is with him, I will require much more positive proof before believing it. I shall not agree to pay the same price to his successor."

On July 23rd plaintiff wrote Rousseau as follows:

"I wish to advise you that I will not move off Estelle until I hear from Mr. Ames."

But a few days later plaintiff did move away, not having heard anything in the meanwhile from Ames, who still continued absent.

This suit followed almost immediately.

From the foregoing it will be seen that there is no conflict whatever between the parties as to the essential facts of this controversy, to-wit: That Rousseau, who was in authority over plaintiff, complained to plaintiff that certain rumors had reached him touching plaintiff's alleged relations with one of the negro girls upon the plantation, in consequence whereof, he had heard, some negro laborers had left the plantation and others were about to leave. That plaintiff repelled the implied charges against himself, but Rousseau insisted, nevertheless, that this negro girl should be sent away from the plantation, and plaintiff peremptorily refused to comply with this order.

That plaintiff was thereupon discharged by Rousseau, and his discharge acquiesced in by Ames.

At this point it were as well to observe that the truth, or falsity, of the rumors which reached Rousseau, is wholly immaterial to any issue involved in the controversy since, as we have said, the sole ground assigned for plaintiff's discharge was his refusal to obey the order to send this negro girl away. But we think it only proper to mention that the evidence does not support the charges alluded to in the rumors, and the foregoing extract from the letter by Ames to the defendant, of June 24th, seems to dispose of them completely.

It is clear then that plaintiff received an order from his superior, and peremptorily refused to comply with it assigning no reason whatsoever for the flat refusal which he gave. He himself says: "the fact is, I positively refused to comply with his request," and thereupon he was discharged.

We think that this was cause sufficient for his discharge, and would not pursue the subject further but for ingenious argument of counsel from which we quote as follows:

"Rousseau did not discharge Vicknair for keeping the girl; nor because Vicknair had threatened with discharge, or worse, any of the hands on the plantation who dared to talk with the girl; nor because some of the hands had already left and others were going to leave the plantation on that account; nor for any previous mismanagement or bad conduct. He claims to have discharged him **solely and only,** because Vicknair would not send the girl away from the plantation.

"Now, was Vicknair justified in refusing to send this girl away from the plantation, at least without a written order from Rousseau? Would he have been justified in sending her away, had he received written orders from Rousseau to do so? We say no.

"At the time of Vicknair's discharge this girl was a minor 18 years of age. She was not employed on Estelle Plantation, and not under the control of Vicknair. Her father was employed thereon as a laborer, and with his wife and children occupied a house on that plantation, furnished him for that purpose by defendant. Whilst so occupied, it was his castle. No one had the right to enter it without his consent. The girl lived in that house with her parents. It was her home. Her only home. Had Vicknair ordered her to leave that home and that plantation, she could properly and well have said:— 'You have no right to order me from my home and I will not go.' If then Vicknair had vi et armis, taken her from that home and put her off the plantation, he would have been guilty of a trespass on the property of the father, of an assault and battery on, and a false imprisonment of, the girl. Had he, instead of ejecting her by illegal force, applied to the Courts in order to have her ejected from her home, and sent out into the world homeless and friendless, he would have met with no success, and at the same time would have been informed, that he had no right to take this girl from her home and from the care and custody of her parents and send her out into the world, with good chances for her complete ruin and degradation."

The answer to this is that there was nothing in the order given to plaintiff from which it could even be inferred that he was to resort to force or to any legal proceeding whatever; he was directed simply "to send this girl away from the plantation." Compliance on his part required no more than that he should notify the girl that she must leave the plantation. Had she refused to leave, plaintiff would then have been fully justified in simply reporting the matter and declining to go further "vi et armis" or otherwise.

But the fact is that this is simply an afterthought. The letter of plaintiff to Ames shows very clearly that plain-

— 49 —

tiff knew full well, that not only the girl herself, but her whole family, would have moved away peacably from the plantation had she been notified to leave. For in that letter he declares it was the fear of this very thing which actuated him in his refusal. He writes to Ames:

"I told him (Rousseau) that I would think over this matter and would let him know the following day. In the meantime I learnt that his brother Octave, who is on Christmas trucking, has been trying to have those people to move down there to work for him. The fact is, I positively refused to comply with his request."

And where a party gives a reason for his conduct and decision touching anything in a controversy, he cannot, after litigation is begun, change his ground and put his conduct upon another and different consideration.

**Railway Co. vs. McCarthy, 96 U. S., 267.**

And then pursuing their argument along the very line just mentioned counsel say:

"The testimony of her father shows, that had she been sent away, he, his wife, and their two sons, all good laborers on that plantation, would have gone also, with the resultant loss to defendant of their labor.

"Had Vicknair sent her away, and her family had gone, and on the return of Mr. Ames he should ask Vicknair why he sent them away, and he had said he was ordered to do so by Rousseau and Rousseau should have denied giving such order, * * * what would Mr. Ames have said and done to Vicknair? Would he not have been in danger of a discharge by Mr. Ames?"

To all of which we can say no more than that the consequences which might have resulted from obeying the order of his superior were no concern of plaintiff's; and had he been discharged for obeying that order instead of

— 50 —

for refusing to do so, our own judgment herein would be different.

Nor can we, even for a moment, admit that an employee may refuse to obey the orders of his superior, and justify his refusal by claiming to fear that that superior might afterwards deny his instructions, and throw upon the employee the blame for any mishap. Such a doctrine would at once make the relations of employer and employee an impossible one at law.

Finally the order was apparently a reasonable one, and whatever might have been plaintiff's reasons for thinking he was justified in refusing to obey, and however valid these might have been we think he should have stated them at the time, and not have contented himself with a mere peremptory refusal to obey.

We think the peremptory refusal of an employee to obey an apparently reasonable order, without assigning any reason at the time, amounts to a defiance of authorit, sufficient to warrant his discharge, and his reason will not thereafter be inquired into.

We have heretofore stated that the defense should have been confined to the reason stated in defendant's letter of discharge to plaintiff. And we find that at the vrey outset plaintiff objected to the testimony then being offered and to any other testimony which might thereafter be offered "for the purpose of showing that plaintiff in this case gave any serious ground of complaint to defendant for his discharge, other than that which is mentioned in the letter of discharge." (Tr., Doc. 37, p. 16.)

This objection was overruled but should have been maintained.

And as we find that practically all the testimony taken by defendant was along the lines objected to and should have been excluded, we shall exercise the discretion vested in us by Act 229 of 1910, p. 388, by taxing the cost

of that testimony upon defendant. The other costs will follow the judgment.

It is therefore ordered that the judgment appealed from be reversed, and it is now ordered that there be judgment in favor of the defendant rejecting the demand of the plaintiff at his cost in both Courts, except the cost of the testimony taken on behalf of defendant which shall be borne by said defendant.

Reversed.

Opinion and decree, February 24th, 1913.

Dufour, J., takes no part.